Ray Gasper v. Commissioner.
Gasper v. Commissioner
Docket No. 32352.
United States Tax Court
1953 Tax Ct. Memo LEXIS 188; 12 T.C.M. (CCH) 772; T.C.M. (RIA) 53234; June 30, 1953
Edgar W. Pugh, Esq., for the petitioner. Charles Speed *189 Gray, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in income tax and additions to tax for negligence against the petitioner as follows: Addition to
tax for
Year
Deficiency
negligence
1943
$ 4,158.08 *
$ 207.90
1944
2,463.53
123.18
1945
1,669.57
83.48
1946
2,882.81
144.14
* Income and Victory tax. The deficiency for 1943 was determined under the provisions of the Current Tax Payment Act of 1943. The issues presented for determination are the correctness of the respondent's action (1) in determining that the petitioner's gross receipts from his bar business were understated for the years 1942 through 1946; (2) in determining the allowances to which the petitioner was entitled for depreciation on the property used in his bar business during the years 1942 through 1946; (3) in determining the amounts the petitioner was entitled to deduct as ordinary and necessary business expenses for the years 1942 through 1946; (4) in determining the specific exemptions to which the petitioner was entitled for the years 1944 through 1946; and (5) whether the period of limitations for assessment has run against assessment of the deficiencies for the years 1943 through 1946. General Findings of Fact A portion of the facts have been stipulated and are found accordingly. During 1942 through 1946 the petitioner resided in Detroit, Michigan, and his income tax returns for those years were filed with the collector for the district of Michigan. Issue 1. Understatement of gross receipts Findings of Fact During the years 1942 through 1946 the petitioner conducted a bar business in Detroit under the name of Ray Gasper's Bar. The following is a statement of the total receipts as reported by petitioner from his bar business, the total receipts from such business as determined by respondent and the amount of understatement of such receipts as determined by respondent for the years 1942 through 1946: Total receipts
Total receipts
Understatement
reported by
determined
determined
Year
Petitioner
by respondent
by respondent
1942
$ 32,652.58
$ 40,106.52
$ 7,453.94
1943
39,074.15
49,684.06
10,609.91
1944
43,648.50
51,943.38
8,294.88
1945
41,389.25
47,303.06
5,913.81
1946
46,182.97
55,557.80
9,374.83
The foregoing determinations of the respondent are based on the report of Deuty Collector John T. Zechini of his investigation of the petitioner's income tax liability for the years 1942 through 1946. The only records submitted by petitioner to Zechini were liquor purchase receipts from the Michigan Liquor Control Commission, receipts for purchases of barrel beer, and various bills for purchases of tobacco and miscellaneous items and additional purchases of beer. Although Zechini made numerous efforts to obtain from the petitioner sales records or memoranda to substantiate the receipts from the business reported by petitioner in his returns, the petitioner did not produce them. Zechini verified with the Michigan Liquor Control Commission all the petitioner's purchases of liquor. Since petitioner purchased barrel beer from only one brewing company, Zechini was able to verify the purchases of barrel beer by checking the sales records of that company. Petitioner's purchases of bottled beer and wine were too numerous and varied for verification. Accordingly, Zechini accepted as correct the total purchases of beer shown in petitioner's income tax returns, subtracted therefrom the verified purchases of barrel beer and determined the remainder to be purchases of bottled beer. Zechini also accepted the amounts shown in the petitioner's returns for purchases of wine, tobacco and miscellaneous items. The amounts reported as expense for labor were verified from the social security tax returns filed by petitioner. Other items of expense reported in the petitioner's returns were accepted by Zechini. In his income tax return for 1945 the petitioner showed his liquor purchases for the year as $ 8,174.27. Zechini determined them to have been $ 8,340.31. For the purpose of determining petitioner's margin of profit on the sale of liquor in 1945, Zechini complied a master sheet of his liquor purchases in that year. The purchases were classified by brands and the number of bottles and the cost thereof of each brand were entered on the master sheet. Zechini then obtained from the petitioner the price charged for each brand as sold over the petitioner's bar, such prices being 25 cents per one ounce drink of the cheaper grades, and 30 cents, 35 cents, 40 cents to 50 cents and 65 cents for the better grades. The selling price per drink of each brand was recorded on the master sheet. The total costs of the various brands then were grouped according to selling prices and the percentage that the total cost of each group was of the total cost of liquor purchases for the year was determined. The average cost per bottle for each group was determined by totaling the cost of one bottle of each brand composing the group and dividing the total cost so obtained by the number of brands in the group. Certain brands which the petitioner informed Zechini could not be sold but were kept for bar use were not included by Zechini in his computations. As a result of his computations, Zechini determined the following with respect to each group of brands sold during the year: Group of
Per cent
Portion of
brands with
Number of
Average
group cost
total costs
selling price
bottles
cost per
was of
applicable
per ounce of
sold
bottle
total cost
to group
25"
239
$ 2.55
11
$ 917.43
30"
1,502
2.85
64
5,337.81
35"
387
3.65
13
1,084.24
40" to 50"
248
3.40
11
917.43
65"
22
5.70
1
83.40
Totals
2,398
100
$ 8,340.31
Zechini conferred with the petitioner as to the number of drinks contained in each bottle and was advised that 22 drinks were obtained from each bottle. Zechini then computed the petitioner's average return per bottle on the basis of 22 drinks per bottle, compared the average return per bottle with the average cost per bottle and determined the percentage mark-up for each group as follows: Group of
brands with
Average return
Average
selling price
per bottle
cost per
Percentage
per ounce of
(22 ounces)
bottle
mark-up
25"
$ 5.50
$ 2.55
116%
30"
6.60
2.85
131%
35"
7.70
3.65
110%
40" to 50"
9.90
3.40
190%
65"
14.30
5.70
150% In the price range of 40 cents to 50 cents where the price changed during the year, Zechini used the mean of 45 cents. The resulting mark-up percentages were then applied to purchases to determine sales as follows: Group of
brands with
selling price
Total
Percentage
Total
per ounce of
purchases
mark-up
sales
25"
$ 917.43
116%
$ 1,981.65
30"
5,337.81
131%
12,330.35
35"
1,084.24
110%
2,276.90
40" to 50"
917.43
190%
2,660.55
65"
83.40
150%
208.50
Totals
$ 8,340.31
$ 19,457.95
Total purchases of barrel beer during 1945 were determined at 827 half barrels. Each half barrel was determined to contain 192 ten ounce glasses with a selling price of 10 cents each, or a total of $ 19.20 per half barrel, or a total of $ 15,878.40 for the 827 half barrels. Case or bottled beer purchases in the amount of $ 828.57 were determined to have a mark-up of 114 per cent, or a total selling price of $ 1,773.14. Other case beer purchases in the amount of $ 2,485.77 were determined to have a mark-up of 106 per cent, or a total selling price of $ 5,120.69. Wine purchases totaling $ 134.78 were determined to have a mark-up of 200 per cent, or a total selling price of $ 404.34. Total tobacco, chips and nut purchases of $ 3,806.12 were determined to have a mark-up of 10 per cent, or a total selling price of $ 4,186.73. The mark-up used for wine was that stated by petitioner and the mark-up used for tobacco, chips and nuts was agreed to by petitioner during the investigation. A recapitulation of the petitioner's sales for 1945 as determined on the basis of the above-stated percentage mark-ups is as follows: Liquor sales
$ 19,457.95
Barrel beer sales
15,878.40
Case beer sales
6,893.83
Wine sales
404.34
Tobacco, chips and nut sales
4,186.73
Total
$ 46,821.25
Zechini also determined the petitioner's sales of liquor and other items for 1942, 1943, 1944 and 1946. Liquor sales were determined by a percentage mark-up method as in the case of 1945. Sales of barrel beer were determined by multiplying the number of half barrels by the number of drinks per half barrel and multiplying that product by the selling price per drink. The sales from other items were determined by the use of percentage mark-ups as follows: Soft
Tobacco,
drinks,
cigars and
nuts and
Year
Case beer
Wine
cigarettes
chips
1942
123
200
10
25
1943
123
200
10
25
1944
114
200
10
25
1946
106
200
10
25
Opinion The primary question under this issue is the correctness of the respondent's action in determining the petitioner's receipts from his bar business by the use of the mark-up method. The petitioner takes the position that the records maintained by him for his bar business correctly reflected his income, including total receipts from that source, that his returns were based on those records, and that the respondent erred in not accepting as correct the gross receipts reported in the returns for the years 1942 through 1946. In support of his position the petitioner relies on his testimony that he made a daily record of his receipts, that the receipts reported in his returns for the years in question were based on the records thus made, that at Zechini's request he submitted the records to Zechini for examination but that Zechini declined to accept them and advised him that his receipts would be determined by a mark-up method. He further stated that he did not recall whether he had received back from Zechini the records he submitted for 1942 through 1945. In support of his action, the respondent relies on the testimony of Zechini and his supervisor, Louis Kellner, that the petitioner was repeatedly asked to furnish evidence as to the receipts from his business for the years in question but he failed to do so. Zechini also testified that on the day of his final conference with the petitioner about his tax liability he returned to petitioner such records as petitioner had submitted with respect to other items for the years in question. During the hearing the petitioner testified that he had beside him his records for 1946 which showed his daily receipts and daily expenditures for that year and that he kept records of the same type for each year. Inasmuch as 1946 is one of the years involved herein and the respondent's reason for making the controverted determinations as to petitioner's receipts was petitioner's failure to furnish records of his receipts, it would appear that petitioner's records for 1946, certainly to the extent they related to receipts from the bar, would have been put in evidence by petitioner. In event such records showed receipts in the amount reported by petitioner in his return for that year they would give support to petitioner's position. However, neither such records for 1946 nor records for any other year were offered in evidence. In this situation we think what was said in Wichita Terminal Elevator Co., 6 T.C. 1158; aff'd 162 Fed. (2d) 513, is applicable here. There we said: "The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. * * *" Accordingly, from the record before us we are unable to find that during the years in controversy the petitioner maintained records showing his receipts. Since it has not been shown that the petitioner maintained records of his receipts, we can not find that the respondent erred in not accepting as correct the receipts reported by petitioner in his returns. The remaining question is whether the method employed by respondent results in a correct reflection of the petitioner's receipts. Since the number of bottles of each brand of liquor sold during each year, the brands contained in each group of selling prices per drink, and the number of one ounce drinks obtained from each bottle were determined, it is not apparent why the respondent used percentage mark-ups to arrive at petitioner's receipts from the sale of liquor. From the facts presented as to liquor sales in 1945, it appears that the method used by the respondent resulted in an overstatement of actual receipts for the year from brands selling at one price and understatements from brands selling at another. To illustrate: The respondent determined that 239 bottles of brands selling at 25 cents per drink were sold in 1945 and that there were 22 drinks obtained from each bottle. On that basis, there were 5,258 drinks sold during the year at 25 cents which would amount to receipts of $ 1,314.50 for the year from such brands. From the evidence submitted $ 1,314.50 would appear to be the greatest amount that the petitioner realized from the sale of 239 bottles of such brands. However, by use of a percentage mark-up the respondent has determined that the total sales of such brands amounted to $ 1,981.65, or an overstatement of more than 50 per cent of the amount the petitioner realized. The respondent determined that 22 bottles of brands selling at 65 cents per drink were sold during the year. This would give a total of 484 drinks which at 65 cents each would amount to $ 314.60. The respondent has determined that the total sales of these brands was $ 208.50, or an understatement of more than 30 per cent of the amount realized by petitioner. Since the method used by respondent produces results at variance with the basic facts, it can not be sustained as one calculated to correctly establish the petitioner's receipts. On the basis of the evidence before us we hold that the petitioner's receipts from the sale of liquor during 1945 are to be recomputed by multiplying the number of bottles in each selling price group by 22 drinks per bottle and multiplying that product by the selling price per drink. So far as appears, the foregoing method is properly applicable to all the other years involved herein. Consequently, we hold that it is to be applied in recomputing liquor receipts during those years. The foregoing method appears to have been employed by respondent for all the years in question in determining the petitioner's receipts from the sale of barrel beer. Accordingly, his determinations as to them are sustained. We are without facts upon which to determine the correctness of the respondent's determinations as to the petitioner's sales or receipts from case beer, wine, tobacco, cigars and cigarettes, and soft drinks, nuts and chips. In this situation we sustain the respondent's action as to them. Issue 2. Allowances for depreciation Findings of Fact The petitioner opened his bar in the fall of 1939. His bar furniture and fixtures, consisting of back bar, front bar, tables, chairs, refrigeration, fans, and signs, including electric signs, were acquired individually from different sources. On the basis of replies by petitioner to inquiries of Zechini that the total cost of furniture and fixtures was approximately $ 4,000 from the beginning of the business, the respondent allowed a deduction in the amount of $ 400 for depreciation for each of the years 1943 through 1946. Through oversight the petitioner was not allowed a like deduction for 1942. Opinion Although the petitioner took no deduction in his returns for depreciation, he now contends that he is entitled to deduct for each of the years 1942 through 1946 $ 1,000 as depreciation on assets acquired in 1939 at a cost of $ 10,000. While petitioner and his wife made some general statements that the furniture and fixtures in petitioner's bar cost in excess of $ 10,000, no evidence was submitted as to any assets not considered in determining the allowances made by respondent, nor was any evidence offered as to the probable useful life of the assets. The respondent concedes on brief that in a recomputation of the petitioner's tax liability for 1942 the petitioner is entitled to a depreciation allowance of $ 400. As an assignment of error, the petitioner stated in his amended petition that the respondent erred in not allowing a reasonable amount of depreciation on assets which were used in the business. In support of the assignment he alleged that a schedule of assets on which depreciation was thereby claimed, together with the amount of such depreciation, would be computed and proper schedules furnished prior to the time the case was calendared for hearing. No schedule of assets or of the depreciation claimed with respect thereto was ever filed. On the state of the record presented we are unable to find that the petitioner is entitled to any greater deductions for depreciation for the years 1943 through 1946 than those allowed by the respondent, or any greater deduction for 1942 than that conceded by the respondent. Issue 3. Ordinary and necessary business expenses Opinion The petitioner has abandoned this issue on brief. Issue 4. Specific exemptions Opinion The question presented by this issue relates to the optional standard deduction provided by section 23 (aa) of the Internal Revenue Code for years beginning after December 31, 1943. On brief the respondent contends that of the years 1944 through 1946, 1944 was the only year for which deductions itemized by petitioner and allowed by respondent were less than $ 500. Respondent concedes that for 1944 the petitioner is entitled to the optional standard deduction of $ 500. In view of respondent's concession the petitioner, on brief, acquiesces in the respondent's position on this issue. Issue 5. Period of limitations Findings of Fact The following is a statement of the dates on which the petitioner filed his income tax returns for the indicated calendar years: Year
Date of filing
1943
March 15, 1944
1944
March 15, 1945
1945
March 15, 1946
1946
March 15, 1947
With respect to the extension of the period of limitations within which assessment might be made of taxes due on said returns, the petitioner and the respondent executed the following successive consents (Forms 872) extending such periods as follows: Expiration date
Year
Date of consent
of consent
1943
February 27, 1947
June 30, 1948
1943
December 20, 1948
June 30, 1950
1943
October 31, 1949
June 30, 1951
1944
December 14, 1948
June 30, 1950
1944
October 31, 1949
June 30, 1951
1945
December 14, 1948
June 30, 1950
1945
October 31, 1949
June 30, 1951
1946
October 31, 1949
June 30, 1951
The deficiency notice with respect to which the petition involved herein was filed was mailed to petitioner on November 6, 1950. Opinion By an amendment to his amended petition, the petitioner has raised the issue of whether the period of limitations for assessment of the deficiency for each of the years 1943 through 1946 as provided by the Internal Revenue Code [1] had expired at the time the deficiency notice was mailed to the petitioner. *190 *191 Section 275(a) provides a period of three years from the time the return is filed within which to make assessment of the tax. However, where the taxpayer omits from his gross income an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in the return, section 275 (c) provides that the tax may be assessed at any time within five years after the return is filed. Section 276 (b) provides that where prior to the expiration of the time prescribed in section 275 for the assessment of the tax, both the Commissioner and the taxpayer consent in writing to assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. Section 276 (b) further provides that the period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. The petitioner makes two arguments against the effectiveness of the consents executed by him. He contends that a consent is executed only to extend the period of limitations in accordance with the intention of the parties, and that since the consents here involved contain no reference to section *192 275 (c) of the Code, or the provisions contained therein, they are to be regarded as relating to the three-year period of limitations provided for in section 275 (a). None of the consents contain any reference to either section 275 (a) or section 275 (b). However, they recite that, in pursuance of the provisions of existing internal revenue laws, the taxpayer and the Commissioner consent and agree that the amount of any income taxes due under any return made by or on behalf of the taxpayer for a stated taxable year under existing acts, or under prior revenue acts, may be assessed at any time on or before a stated date, except that if a notice of deficiency in tax is sent to said taxpayer by registered mail on or before said stated date, then the time for making any assessment as aforesaid shall be extended beyond said stated date by the number of days during which the Commissioner is prohibited from making an assessment and for sixty days thereafter. Except for the restrictions as to the taxable years involved and the dates to which the time for making assessment was extended, the consents contain nothing to indicate that their application was limited to either the three-year period *193 of limitations provided for in section 275 (a) or to the five-year period provided for in section 275 (c). That being the situation, we must conclude that by executing the consents the petitioner and the respondent intended that the consents should relate to whichever period of limitations was applicable to the years stated therein. Therefore, he petitioner's contention is denied. The petitioner also contends that his gross income was not understated in his returns by more than 25 per cent and that consequently the five-year period of limitations provided for by section 275 (c) has no application here. Until there is a recomputation under Rule 50 of his gross income for the various years in accordance with the method heretofore directed and the amount of his gross income and the extent to which it has been understated are ascertained, it can not be determined whether the period of limitations provided for in section 275 (c) is or is not applicable. However, in event a recomputation discloses that petitioner's gross income as reported in his returns was understated by more than 25 per cent, then the provisions of section 275 (c) will be applicable. For each of the years, a consent *194 was executed before the expiration of five years from the time the return was filed extending the period of limitations. Such consents for the years 1943, 1944 and 1945 extended the periods for assessment until June 30, 1950. Before the expiration of those consents others were executed extending the period until June 30, 1951. The one consent executed for 1946 extended the period until June 30, 1951. Since the deficiency notice was mailed on November 6, 1950, it was mailed prior to the expiration date of the consents. May D. Hatch, 14 T.C. 237, reversed on another point, 190 Fed. (2d) 254. In even a recomputation discloses that the petitioner's gross income as reported in his returns was understated by more than 25 per cent, it must be concluded that the respondent's determination of the deficiencies was timely made. In event a recomputation discloses that the petitioner's gross income as reported in his returns was not understated by more than 25 per cent, then the respondent's determination of the deficiencies was not timely made and assessment of the deficiencies is barred by expiration of the applicable periods of limitations. Although no error was *195 alleged in the petition, and no issue was otherwise raised in the pleadings, as to the correctness of the respondent's action in determining additions to the tax for negligence, the parties have discussed the question on brief. Issues not raised by the pleadings will be disregarded and not considered. John Gerber Co., 44 B.T.A. 26; George R. Kemon, 16 T.C. 1026. Decision will be entered under Rule 50. Footnotes
1. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * *
(c) Omission From Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed. * * *
SEC. 276. SAME - EXCEPTIONS. * * *
(b) Waiver. - Where before the expiration of the time prescribed in section 275 for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. * * *↩